UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ARTHUR SCOTT,

      Plaintiff,

v.                          Case No: 2:21-cv-674-JES-NPM

CITY OF CAPE CORAL, FLORIDA,
ANTHONY SIZEMORE, in his
official capacity as Chief
of Cape Coral Police
Department, HUMBERTO
VAZQUEZ, individually, and
CAROLINE SEWRY-MARTINS,
individually,

      Defendants.

_____

**OPINION AND ORDER**

This matter comes before the Court on Defendants' Motion for Summary Judgment. (Doc. #48.) Plaintiff filed a Response in Opposition (Doc. #52), and Defendants filed a Reply. (Doc. #62.) For the reasons set forth below, the motion is denied as moot as to defendant Caroline Serwy-Martins[1] (who was previously dismissed) and is otherwise granted.

_____

[1] Officer Caroline Serwy-Martins' name is spelled as "Sewry-Martins" in Scott's Complaint and his Amended Complaint. (See Docs. ##1, 35.) As a result, this is how the Officer's name appears in the Court's CM/ECF system. In her deposition, however, the Officer testified that her name is correctly spelled "Serwy." Serwy-Martins Dep. 7:6. Herein, the Court will use her correct name spelling.

I.

The parties initially agreed that the material facts are undisputed and are largely established by video from the officers' body cameras.  (See Doc #62, p. 1) ("Indeed, the material facts are not disputed; they are on camera."); (Doc #52, p. 1) ("Defendants are also correct in that the events of the encounter, captured on camera, are undisputed.").  Plaintiff later argued, however, that there are disputed issues of material facts which preclude summary judgment.  (Doc. #52, pp. 10, 13.)  In any event, for summary judgment purposes the undisputed material facts (herein the "summary judgment facts") are as follows:

On March 31, 2019, a neighbor reported to the Cape Coral Police Department that a male (later identified as plaintiff Arthur Scott) and a female (later identified as his girlfriend Samantha Malay) were yelling and screaming in a certain apartment. Police dispatch relayed the information and officers Humberto Vazquez (Officer Vazquez) and Caroline Serwy-Martins (Officer Serwy-Martins) of the Cape Coral Police Department responded separately to the apartment complex at about 6:15 p.m.

Officer Vazquez arrived first and spoke briefly with Ms. Malay in a parking lot in front of the apartment complex.  Ms. Malay advised Officer Vasquez that Scott had pushed her and hit her in the face, and that she had made Scott's nose bleed in her efforts

to push him away.   Officer Vazquez left Ms. Malay and went to Scott's apartment, but no one answered when he knocked on the door.

Meanwhile, Officer Serwy-Martins arrived at the apartment complex and spoke with Ms. Malay in the parking lot.  Ms. Malay said she had a verbal altercation with Scott that had become physical.  Ms. Malay further stated that they had both pushed each other while inside the apartment, and Scott had received a bloody nose.  Officer Serwy-Martins directed Ms. Malay to follow her, and they both headed toward a dock behind the apartment complex.

Officer Vazquez arrived at the dock first and found Scott standing on it with blood drying on his face. Officer Vazquez approached Scott and said "I'm gonna need you to step over here for me, okay?" Scott responded "for what? Why?" Officer Vazquez replied, "Well they called the police and were trying to figure out what's going on."  Officer Vazquez told Scott two more times to "step over here." By then Officer Serwy-Martins had arrived and she interjected, "What's the problem? He asked you three times and you're still like I'm not going." Scott seemingly ignored the comment, turned his back to the officers, and slightly pivoted a chair next to him. Officer Serwy-Martins stated, "Are you fucking serious?" The comment ignited a short back and forth between the three, but Scott eventually walked off the dock and towards the officers.

Officer Serwy-Martins said, "Alright, let me pat you down, I wanna see if you have any weapons on you. Come over here." As Scott approached, she said "put your hands on your head for me." Scott proceeded to raise his arms but, instead of putting his hands on his head, he put them on a nearby palm tree. With Scott's back to her, Officer Serwy-Martins reached for her handcuffs and repeated: "I want them on your head. Right now. Put your hands on your head for me." After two or three seconds of stillness, Officer Serwy-Martins said "alright," and grabbed Scott's arm in an apparent attempt to handcuff him. Scott's arm swung back, he turned to face Officer Serwy-Martins, and said "are you fuckin—you're gonna place me in fucking handcuffs? For what?" Officer Vazquez then tackled Scott to the ground in what Scott characterizes as an "unlawful take down." (Doc. #35, ¶ 30.)

Upon impact, Scott immediately started shrieking and groaning. After handcuffing Scott, Officer Serwy-Martins attempted to turn the facedown Scott over.  Scott exclaimed "wait, wait," "my leg, oh please, just let my leg go." Officer Vazquez, who was still straddled over Scott, got up and slightly moved Scott's leg. Scott screamed in apparent pain and Officer Serwy-Martins asked, "Do you want me to call EMS?" Scott responded "Yes."

Scott laid on the ground for approximately eight minutes until Fire Department personnel arrived. At that point he was uncuffed and the Fire Department personnel began evaluating him.

Approximately another two minutes passed until EMS personnel arrived, and likewise started evaluating Scott.  Officer Vazquez told an EMS medic: "He got into an altercation with his girlfriend, which is why he can't move apparently. Yeah, it's one of those things, what do you call it, incarceritis I think?"

EMS continued evaluating Scott, and after about six minutes an EMS medic declared "as far as we're concerned, he's good to go." Immediately afterwards, an unidentified officer standing directly behind Scott said, "alright sir, stand up." This command was repeated twice more before Officer Sarah Johnson stood Scott up with the aid of other officers. Scott was re-handcuffed and led to start walking by an unidentified officer. On his first step, Scott grimaced. Officer Zarillo commented "Now we're gonna play the 'my hip hurts game,'" and Scott retorted "I'm not playing no game, guy!"

Scott took about three steps before he shrieked and fell to the ground. The unidentified officer and Officer Zarillo picked Scott up — Officer Zarillo from the left arm and the unidentified officer from the right arm. Scott took another couple steps before his legs went limp and the officers started dragging him. These officers dragged Scott for about eight seconds before Officer Zarillo stopped and exclaimed, "Stand up and walk like an adult!" Scott responded "I can't! My fucking leg is killing me!" whereupon the deputies continued to drag Scott with his legs dangling.

The officers dragged Scott a couple more steps until they reached the front of the apartment complex. They then laid Scott on the pavement. The officers repeatedly told Scott to "get up" and Scott repeatedly responded that he could not. The unidentified officer and Officer Johnson then picked Scott up.  Scott took a couple more steps before whimpering "I really can't walk," and fell again. At this point, Officer Zarillo signaled for the medics and told the other officers "alright . . . drop him. Put him for medics, let medics take him."

With Scott audibly shrieking and howling in the background, Officers Vazquez and Serwy-Martins spoke with the alleged victim near the dock.  The same EMS medic that initially cleared Scott returned and said: "I talked to him, he's fine. His hip is—sorry to say—but his hip is hurting because he doesn't want to go to jail. He doesn't—he thinks that if he tells us his hip is hurting he won't go to jail."

While at the front of the apartment complex, Officer Johnson stood over Scott and told him "So we're gonna transport you but were gonna sit with you and you're still going to jail." Scott interjected "That's fine! I'm good with that!" Officer Johnson continued, "cause you are a piece of shit that does not need medical attention." Officer Johnson kept lambasting Scott and, in the middle of it, Scott asked, "Can you just pull my leg out?" Officer Johnson quickly answered "Fuck no."

EMS arrived and put Scott onto a stretcher. Officer Johnson stood next to the stretcher and told Scott "Hey guess what. When you get to the hospital, they are gonna do the same thing they just did, and they are going to see how a terrible of an actor you are as well." Scott replied "Ok, that is good to know." Officer Zarillo then said, "I just hope the catheter doesn't hurt!" Officer Johnson began to walk away from the stretcher and remarked, "Grown man with a tramp stamp."  Officer Johnson then returned to Scott's side by the stretcher and the following interaction took place:

> Officer Johnson: It's called incarceritis, its very common—when people find out they're going to jail—
>
> Scott: I'm not listening to this.
>
> Officer Johnson: Well, you should, I'm actually pretty smart—incarceritis—
>
> Scott: I've been in prison for ten years, bitch.
>
> Officer Johnson: Then you would know.

At this point, EMS started to wheel the stretcher with Scott on it towards the ambulance. Officer Johnson walked alongside it, continuing the dialogue with Scott:

> Scott: Exactly
>
> Officer Johnson: Then you would know you dumb fucking piece of shit.
>
> Scott: Hit me. Hit me.

> Officer Johnson: I would love to. I would
> fucking love to.
>
> Scott: For nothing?
>
> Officer Johnson: You are the biggest piece of
> fucking shit. Listen, I hope when you lay on
> that bed you realize—what a piece of—wow I'm
> such a piece of shit taking this hospital bed
> from someone that actually needs it. But I
> have a dislocated hip and now I'm paralyzed.
>
> Scott: Save your breath.
>
> Officer Johnson: Save my breath? Guess what?
> I'm going home tonight. You're not. You're
> still a piece of shit. You're going to jail.
> Bye.

Scott was transported to the Hospital and underwent the first of two surgeries for a fractured and dislocated hip.  After his release from the hospital, Scott was arrested and the State Attorney's Office filed one misdemeanor charge.  After 41 days in jail, Scott pled *nolo contendere* to resisting/obstructing without violence.

## II.

Plaintiff's seven-count Amended Complaint (Doc. #35) is the operative pleading. Five counts remain after the dismissal with prejudice of Counts III and VII against Officer Serwy-Martins (Doc. #59) pursuant to the parties' Joint Stipulation of Dismissal with Prejudice. (Doc #58.)  The remaining five counts are: (1) excessive force against the City of Cape Coral and Chief Sizemore in his official capacity pursuant to § 1983 (Count I); (2) excessive force

against Officer Vazquez in his individual capacity pursuant to §
1983 (Count II); (3) battery under Florida law against Officer
Vazquez in his individual capacity (Count IV); (4) negligence under
Florida law against the City of Cape Coral and Chief Sizemore in
his official capacity (Count V); and (5) negligence against Officer
Vazquez in his individual capacity (Count VI).

All defendants move for summary judgment as to their
respective counts, arguing there are no genuine issues of material
fact and that they are entitled to judgment in their favor as a
matter of law. (Doc #48.) Plaintiff argues that summary judgment
is not warranted on any count. (Doc. #52.)

**A. Summary Judgment Principles**

Summary judgment is proper where the evidence "shows that
there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
As the Eleventh Circuit recently summarized:

> "If no reasonable jury could return a verdict
> in favor of the nonmoving party, there is no
> genuine issue of material fact and summary
> judgment will be granted." To defeat summary
> judgment, "a mere scintilla of evidence
> supporting the opposing party's position will
> not suffice; there must be enough of a showing
> that the jury could reasonably find for that
> party."
>
> At the summary judgment stage, "we view
> the evidence, draw all reasonable factual
> inferences, and resolve all reasonable doubts
> in favor of the non-movant." But we do so only
> "to the extent supportable by the record."

> "When opposing parties tell two different
> stories, one of which is blatantly
> contradicted by the record, so that no
> reasonable jury could believe it, a court
> should not adopt that version of the facts for
> purposes of ruling on a motion for summary
> judgment." Thus, "in cases where a video in
> evidence obviously contradicts the
> nonmovant's version of the facts, we accept
> the video's depiction instead of the
> nonmovant's account and view the facts in the
> light depicted by the videotape."

Baxter v. Roberts, 54 F.4th 1241, 1253 (11th Cir. 2022)(citations

omitted).  See also Robinson v. Sauls, 46 F.4th 1332, 1340 (11th

Cir. 2022). If the videos "do not answer all questions or resolve

all the details of the encounter, we view the evidence in the light

most favorable to" the non-moving party.  Johnson v. City of Miami

Beach, 18 F.4th 1267, 1269 (11th Cir. 2021).

**B. 42 U.S.C. § 1983 Principles**

Scott asserts two claims pursuant to 42 U.S.C. § 1983. (Doc.

#35, ¶¶ 60, 70.)  Section 1983 provides a private cause of action

against any person who, under color of state law, deprives a person

of "any rights, privileges, or immunities secured by the

Constitution and laws" of the United States. 42 U.S.C. § 1983. "To

state a claim for relief in an action brought under § 1983,

[plaintiffs] must establish that they were deprived of a right

secured by the Constitution or laws of the United States, and that

the alleged deprivation was committed under color of state law."

<u>Focus on the Family v. Pinellas Suncoast Transit Auth.</u>, 344 F.3d 1263, 1276-77 (11th Cir. 2003)(citation omitted).

"A constitutional claim brought pursuant to § 1983 must begin with the identification of a specific constitutional right that has allegedly been infringed." <u>DeMartini v. Town of Gulf Stream</u>, 942 F.3d 1277, 1288 (11th Cir. 2019) (quoting <u>Paez v. Mulvey</u>, 915 F.3d 1276, 1285 (11th Cir. 2019)). Here, the Amended Complaint identifies the Fourth Amendment as the constitutional right at issue in the case. (Doc. #35, ¶¶ 4, 60, 62, 70.)[2] It is undisputed that the conduct of the officers was committed under color of state law, so that element of a § 1983 claim is satisfied.

## C. Fourth Amendment Excessive Force Principles

The Fourth Amendment's prohibition against unreasonable seizures encompasses the right to be free from the use of excessive force during a seizure. <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989); <u>Robinson</u>, 46 F.4th at 1341. "Unlike a false arrest claim, a genuine excessive force claim is not resolved by the existence of probable cause. Even when an officer has probable cause for an arrest, the

---

[2] The Amended Complaint makes reference in a single sentence to the police actions being "in retaliation for Scott exercising his rights protected under the First Amendment of the U.S. Constitution" (Doc. #35, ¶1), but none of the actual counts set forth a claim under the First Amendment. The Amended Complaint also summarily refers to the First and Fourteenth Amendments (<u>Id.</u> at ¶7), but no such counts are actually asserted. In his Response, Scott asserts that his excessive force claim arises under the Fourth Amendment. (Doc. #52, p. 11.)

manner in which a search or seizure is conducted must nonetheless comply with the Fourth Amendment." Richmond v. Badia, 47 F.4th 1172, 1180 (11th Cir. 2022) (punctuation and citation omitted). "When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." Cnty. of L.A., Cal. v. Mendez, 581 U.S. 420, 428 (2017). As the Supreme Court has summarized:

> In assessing a claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." "A court (judge or jury) cannot apply this standard mechanically." Rather, the inquiry "requires careful attention to the facts and circumstances of each particular case." Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."

Lombardo v. City of St. Louis, Mo., 141 S. Ct. 2239, 2241 (2021)(internal punctuation and citations omitted); see also Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 8 (2021). While Lombardo dealt with a Fourteenth Amendment excessive force claim, "the Fourteenth Amendment's standard is analogous to the Fourth Amendment's." Patel v. Lanier Cnty. Georgia, 969 F.3d 1173, 1182 (11th Cir. 2020). See also Piazza v. Jefferson Cnty., Ala., 923 F.3d 947, 953 (11th Cir. 2019)("[T]he Fourteenth Amendment

standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment.").

The Court views the circumstances from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and accounts for the fact that officers are often required to make "split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Plumhoff v. Rickard, 572 U.S. 765, 775 (2014) (quoting Graham, 490 U.S. at 396-97). See also Robinson, 46 F.4th at 1341; Charles v. Johnson, 18 F.4th 686, 699-700 (11th Cir 2021).

**D. Florida Negligence Law Principles**

"[A] cause of action for negligence arises where one's 'failure to use that degree of care which a reasonably careful person would use under like circumstances' causes injury." Kohl v. Kohl, 149 So. 3d 127, 131 (Fla. 4th DCA 2014)(quoting London v. Atl. Mut. Ins. Co., 689 So.2d 424, 425 (Fla. 4th DCA 1997)). As the Eleventh Circuit has recently stated:

> Under Florida law, a plaintiff must establish four elements to sustain a negligence claim: (1) "the defendant owed a 'duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks' "; (2) "the defendant failed to conform to that duty"; (3) there is " '[a] reasonably close causal connection between the [nonconforming] conduct and the resulting injury' to the claimant"; and (4) "some actual harm."

Sutton v. Wal-Mart Stores E., LP, 64 F.4th 1166, 1169 (11th Cir. 2023) (alteration in original)(quoting Williams v. Davis, 974 So. 2d 1052, 1056 (Fla. 2007)).

### E. Florida Battery Principles

"A battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." Paul v. Holbrook, 696 So. 2d 1311, 1312 (Fla. 5th DCA 1997)(citing Sullivan v. Atl. Fed. Sav. & Loan Ass'n, 454 So.2d 52, 54 (Fla. 4th DCA 1984)). The Eleventh Circuit recently summarized the Florida legal principles of battery in the context of a law enforcement officer conducting an arrest:

> In Florida, battery has two elements: (1) "inten[t] to cause a harmful or offensive contact," and (2) a resulting "offensive contact with the person of the other." In the arrest context, "[a] battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." "If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery."

Baxter, 54 F.4th at 1272-73 (alteration in original)(quoting City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)). "But," the Eleventh Circuit clarified, "ordinary incidents of [an] arrest . . . do not give rise to an independent tort." Id. at 1273 (alteration in original)(quoting Lester v. City of Tavares, 603 So. 2d 18, 19-20 (Fla. 5th DCA 1992); see also Johnson v. City of Miami Beach, 18 F.4th 1267, 1275 (11th Cir. 2021).

**F. Qualified Immunity Principles**

The Eleventh Circuit recently summarized qualified immunity's legal principles:

> "Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." To receive qualified immunity, the "defendant must first show he was performing a discretionary function." The plaintiff then bears the burden of proving both that the defendant violated his constitutional right and that "the right was clearly established at the time of the violation."

Washington v. Howard, 25 F.4th 891, 897-98 (11th Cir. 2022)(citations omitted). See also Baker v. City of Madison, Alabama, 67 F.4th 1268, 1278 (11th Cir. 2023). Accordingly, officers who act within their discretionary authority are "entitled to qualified immunity under [section] 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)(internal punctuation and citations omitted). "On the second prong, only decisions of the United States Supreme Court, [the Eleventh Circuit], or the highest court in a state can 'clearly establish' the law." Crocker v. Beatty, 995 F.3d 1232, 1240 (11th Cir. 2021)(quoting Gates v. Khokhar, 884 F.3d 1290, 1296 (11th Cir. 2018)), cert. denied, 142 S. Ct. 845 (2022).

To show a right was clearly established, a plaintiff must identify within this limited universe of case law either (1) a binding case with indistinguishable facts, (2) a broad statement of principle within the Constitution, statute, or case law, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law. Id; Davis v. Waller, 44 F.4th 1305, 1312-13 (11th Cir. 2022). The second and third options can suffice, but rarely. Id. This is because the "existing precedent must have placed the statutory or constitutional question beyond debate" so as to afford "government officials breathing room to make reasonable but mistaken judgments," thereby "protect[ing] all but the plainly incompetent or those who knowingly violate the law." Carroll v. Carman, 574 U.S. 13, 16 (2014) (per curiam) (internal citations and punctuation omitted). Ultimately, "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions" Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018), and entitlement to qualified immunity is for the court to decide as a matter of law. Baxter, 54 F. 4th at 1256.

It is clear from the undisputed facts that the officers were acting within the scope of their discretionary authority during their interaction with Scott. Therefore, Scott will bear the burden of showing that: (1) the summary judgment facts show the officers' conduct violated a federal right, and (2) the federal right in

question was clearly established at the time of the violation. Tolan v. Cotton, 572 U.S. 650, 655-57 (2014); Baker, 67 F.4th at 1278.

**III.**

The Court begins with the § 1983 claim against Officer Vazquez in Count II, followed by the § 1983 official capacity claim in Count I, and closes with the state law claims.

### A. Count II – Fourth Amendment Excessive Force Against Officer Vazquez In His Individual Capacity Pursuant to 42 U.S.C. § 1983

Count II of the Amended Complaint asserts that on March 31, 2019, Officer Vazquez deprived Scott of his right under the Fourth Amendment to be free from excessive force. (Doc. #35, ¶ 69-76.) Count II incorporates the first fifty-five paragraphs of the Amended Complaint. (Id. at ¶ 69.) The force used by Officer Vazquez is characterized as an "aggressive take down of an un-resisting Scott without legal justification" (id. at ¶ 1) using a tackle as Officer Serwy-Martins was attempting to handcuff Scott.[3] Officer Vazquez asserts that summary judgment is warranted because his use of force was reasonable and, alternatively, he is immune

---

[3] Paragraph 1 also asserts that Officer Vazquez "forced Scott to walk on his fractured/dislocated hip . . . ." (Id. at ¶ 3.) But the other paragraphs assert, and the videos show, that it was other officers who exerted this force on Scott. Where the video evidence clearly contradicts Scott's telling of the facts, such as here, the Court accepts the video's account over Scott's. See Baxter, 54 F.4th at 1253.

from suit pursuant to qualified immunity. (Doc. #48, pp. 15-19.)
Plaintiff asserts that factual disputes preclude summary judgment.
(Doc. #52, p. 13.)

Excessive force claims in the context of an investigative
detention such as in this case are judged under the Fourth
Amendment objective reasonableness standard. Richmond, 47 F. 4th
at 1182. "Determining whether an officer's use of force is
unconstitutionally excessive involves two steps. First, we ask
whether the specific kind of force is categorically
unconstitutional. Second, if the kind of force is not categorically
unconstitutional, we then ask, weighing the Graham factors,
whether the amount of force was excessive." Charles, 18 F.4th at
699.

### (1)   No Categorically Unconstitutional Kind Of Force

The parties have a minor dispute over how to characterize the
takedown move by Officer Vazquez.  Scott refers to it as a
"sweeping leg motion" (Doc. #52, p. 5.), while Officer Vazquez
refers to it as an arm maneuver. Vazquez Dep. 72:4. Whatever it
may be called, the video shows it was essentially a tackle by the
officer.  The Eleventh Circuit has "never held that a tackle is a
categorically unconstitutional kind of force." Charles, 18 F.4th
at 699.

**(2)  Force Was Not Excessive**

Since the tackle by Officer Vazquez was not categorically unconstitutional, the question becomes whether it was nonetheless excessive after considering the relevant factors. See id. Those factors include:  (a) the severity of the crime at issue; (b) whether the suspect poses an immediate threat to the safety of the officers or others; (c) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; (d) the relationship between the need for the use of force and the amount of force used; (e) the extent of the plaintiff's injury; (f) any effort made by the officer to temper or to limit the amount of force; (g) the severity of the security problem at issue; and (h) the threat reasonably perceived by the officer.  See Graham, 490 U.S. at 396; Lombardo, 141 S. Ct. at 2241; Patel v. City of Madison, Ala., 959 F.3d 1330, 1339 (11th Cir. 2020).  "Ultimately, '[a]n officer's use of force is excessive under the Fourth Amendment if the use of force was objectively unreasonable in light of the facts and circumstances confronting the officer.'" Baker, 67 F.4th at 1279 (quoting Fils v. City of Aventura, 647 F.3d 1272, 1287 (11th Cir. 2011)).

The context of the events was a Terry detention of Scott after the officers were dispatched on a domestic violence call. The Court concludes that the summary judgment evidence establishes Officer

Vazquez's use of force was objectively reasonable in light of the facts and circumstances confronting the officers:

**(a)  Severity of Crime**

The officers were responding to a crime involving violence, that is, a dispatch for battery-domestic violence. (Doc. #55, Ex. 1, p. 2.)[4] On the scene, the victim confirmed the violent nature of her encounter with Scott to both officers separately, stating Scott had pushed her and hit her in the face and that she had bloodied Scott's nose. (Doc. #55, Ex. 3 (0:47-1:00).) Indeed, Scott was sporting a bloody face when the officers encountered him on the dock. A crime involving personal violence is a severe crime. This first factor supports Officer Vazquez's use of force.

**(b)  Immediate Threat to Officer Safety**

Scott did not initially pose an immediate threat to Officer Vazquez or Officer Serwy-Martins. But any reasonable officer would have viewed Scott with caution and reasonable suspicion from the outset. The officers were aware Scott had allegedly used violence against his girlfriend and had himself been bloodied during that confrontation. Their suspicion and caution could have only risen when Scott was slow to respond to and comply promptly with the

---

[4] In the supplement to his response for summary judgment (Doc. #55), Plaintiff labeled his exhibits, including this one, in letter format (A,B,C, etc.). Instead of the alphabetical letters used by Plaintiff, the Court will cite each exhibit by the numerical number assigned to it by the Court's CM/ECF system.

officers' reasonable directives.  The video evidence shows that Scott was ordered three times to step off the dock and come inland. (Doc. #55, Exs. 2-3.)  It also shows Scott was ordered to put his hands on his head three separate times.[5]  (Id.)  Under the circumstances, Officer Serwy-Martins was justified in wanting to pat down and handcuff Scott, neither of which converted the Terry encounter into an arrest. The officers' conduct up to this point was in full compliance with the Fourth Amendment, and Scott does not assert a claim otherwise. Officer Vazquez then watched as Scott rapidly turned face-first toward Officer Serwy-Martins while hurling expletives at her.

Scott's actions would lead any reasonable officer to view him as hostile and unpredictable. Scott was angry, acting abruptly, and was now directly facing Officer Serwy-Martins. Officer Vazquez made a split-second decision. The law does not require officers to wait until the moment a suspect uses force to act.  Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007). It also gives certain deference to split-second decisions. Graham, 490 U.S. at 396-97(1989)("The

---

[5] Scott argues he was unable to comply with the order to put his hands behind his head because of a preexisting shoulder injury. (Doc. #52, p. 12.) But in the Eleventh Circuit, "[w]e do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act." Rodriguez v. Farrell, 280 F.3d 1341, 1351-53 (11th Cir. 2002). Because Scott did not communicate to the officers that he suffered from a preexisting shoulder injury nor was it apparent, his excuse is immaterial to the analysis.

calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.") An objectively reasonable officer would have believed that Scott posed an immediate threat to the safety of Officer Serwy-Martins at the time Scott was tackled by Officer Vazquez. The second factor favors Officer Vazquez's use of force.

    **(c)  Actively Resisting**

The third factor concerns whether Scott was actively resisting the officers, a point on which the parties disagree. (See Doc. #48, p. 17.) ("Yet the video evidence reveals that Scott actively physically resisted Officer Serwy-Martins' attempts to handcuff him."); Scott Dep. 53:22-55:8 (describing Scott's reaction as an "involuntary twitch."). The video evidence establishes that Scott initially failed to obey three lawful commands from Officer Vazquez to step off the dock. Scott then failed to obey three lawful commands from Officer Serwy-Martins to put his hands on his head. This conduct, however, does not alone qualify as active resistance. Longino v. Henry Cnty., 791 Fed. Appx. 828, 837 (11th Cir. 2019)(finding no active resistance when

suspect kept his hands still instead of moving them to his back as commanded by officers).[6]

Scott's movement when Officer Serwy-Martins attempted to handcuff him, however, does constitute active resistance. Scott admits that he pulled away when Officer Serwy-Martins attempt to handcuff him, but asserts the action was because he was startled.[7] Even if the video evidence is inconclusive as to whether Scott was startled, it clearly shows Scott cursing at Officer Serwy-Martins as Scott pulled away his arm. An objectively reasonable officer would perceive Scott to have exhibited some active resistance when he pulled his arm away. This third factor favors Officer Vazquez's use of force.

### (d)  Relationship Between Need For and Amount of Force

The summary judgment evidence shows Officer Vazquez performed a basic tackle in response to Scott's aggressive conduct towards Officer Serwy-Martins. The tackle did not appear to be malicious or sadistic; Officer Vazquez did not wantonly swing Scott to the ground or repeat the maneuver, but used a single tackle to

---

[6] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." Bonilla v. Baker Concrete Const., Inc., 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

[7] (Doc. #52, p. 2) ("Startled, Scott pulls away and Vazquez immediately executes a brutal and excessive takedown on Scott . . . ."); (see also id., p. 13) (contending that the video depicts Scott acting "startled, not resistive.").

neutralize Scott. Ultimately, "a tackle was among the least forceful ways to advance the arrest and gain control of the situation." Charles, 18 F.4th at 700. The amount of force excreted by Officer Vazquez was proportional to the force needed to subdue Scott and ensure Officer Serwy-Martins' safety. See Burke v. Bowns, 653 Fed. Appx. 683, 696 (11th Cir. 2016)(finding "officers had a significant need to bring Plaintiff under control" after failing to comply with orders and shouting expletives). This fourth factor favors Officer Vazquez's use of force.

    **(e)  Extent of Injury**

Scott suffered a fractured hip as a result of the tackle. Scott has since apparently undergone multiple surgeries. Despite the medical procedures, Scott testified doctors have opined it will cause him "chronic pain the rest of [his] life." Scott Dep. 92:8. The extent of the injury appears severe. This fifth factor weighs against Officer Vazquez's use of force.

    **(f)  Effort to Temper or Limit Amount of Force**

The summary judgment evidence indicates that Officer Vazquez attempted to temper or limit the amount of force used with Scott. First, Officer Vazquez gave Scott multiple opportunities to comply by repeating his orders. Officer Vazquez explained to Scott why he was asking him to come off the dock. With Scott becoming increasingly irate and hostile, the officers attempted to peacefully handcuff him. These facts show Officer Vazquez "went to

24

great lengths to temper the severity of the force used, and indeed sought to avoid the use of force altogether." Burke, 653 F. App'x at 696. Second, Officer Vazquez promptly stood up after tackling Scott and, after noticing he seemed to be in pain, EMS was immediately called. This also shows Officer Vazquez attempted to temper the severity of the tackle. Cockrell v. Sparks, 510 F.3d 1307, 1312 (11th Cir. 2007)("[T]he fact that [the officers] immediately summoned medical assistance for [plaintiff], 'temper[ed] the severity of [the] forceful response' . . . .")(quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)). This sixth factor favors Officer Vazquez's use of force.

### (g)  **Severity of Security Problem**

The security risk Scott triggered was substantial. As more thoroughly discussed above, Scott was disobeying orders, screaming expletives, and actively resisting. The officers had tried to secure Scott in handcuffs but were unable to. Instead of complying, Scott pulled away from Officer Serwy-Martins. The six-foot-one Scott then hastily turned towards the smaller Officer Serwy-Martins, who was within his immediate reach. See Doc. #55, Ex. I; see also Serwy-Martins Dep 9:8. In his deposition, Officer Vazquez explained that it is pivotal to have control of a suspect's hands "so the hands don't become a weapon or a threat." Vazquez Dep. 54:24-25. At the time of the tackle, the officers did not have any control over the irate and unpredictable Scott. He posed a serious

security problem to the officers, especially Officer Serwy-Martins. This seventh factor favors Officer Vazquez's use of force.

**(h)   Threat Reasonably Perceived by Officer Vazquez**

Officer Vazquez reasonably perceived a threatening situation. In his deposition, Officer Vazquez testified that he did not initially sense any aggression from Scott when he was on the dock. Id., 67:14. Officer Vazquez noticed Scott had something in his hand, but he did not think it was a weapon. Id., 67:18-19. When Scott got closer and put his hands on the palm tree, Officer Vazquez was able to visually confirm Scott was not holding any weapons. Id., 71:2. But Scott left his hands on the palm tree instead of complying with orders to place his hands on his head. Officer Vazquez explained the significance between the two:

> So, putting your hands on top of your head interlocking the fingers, allows us to grab onto your fingers and hold your hand in place while keeping our other hand free to search or place handcuffs. Whereas if you place your hands above your head it's—there's no control. It's only a visibility perspective. We can see your hands, but we don't have control of the subject.

Id., 55:13-20. Without control of Scott's hands, Officer Vazquez worried Scott could use them, his elbows, or the arms themselves as weapons. See id., 71:3-5. Officer Vazquez then watched as Scott "pulled away from Officer [Serwy-Martins'] hand and broke, pretty much broke her grip and began to turn around." Id., 71:23-25.

A reasonable officer would have perceived Scott's erratic and uncomplying conduct to be threatening. This eighth factor favors Officer Vazquez's use of force.

All told, seven of the eight factors favor Officer Vazquez's use of force. Only the extent of Scott's injury weighs against Officer Vazquez's use of force. The Supreme Court has clarified that "[i]njury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." Wilkins v. Gaddy, 559 U.S. 34, 38 (2010). As a result, no "unforeseeable injuries can transform a reasonable application of force into an excessive one." Lanier Cnty. Ga., 969 F.3d at 1184. That is precisely the case here. While it is unfortunate that Scott suffered a severe injury, that fact alone does not mean Officer Vazquez used excessive force. To the contrary, based on the surrounding facts, circumstances and the other factors, it is clear Officer Vazquez's use of force was not unconstitutionally excessive.

The Court recognizes Scott's argument that he was subject to "excessive post-detention force, by [being] forc[ed] to walk on the fractured right hip . . . ." (Doc. #52, p. 15.) But the summary judgment facts establish that Officer Vazquez was not involved in this conduct; he did not force Scott to walk and did not carry him. (See Doc. #55, Ex. 2, 22:38-23:43.) Officer Vazquez cannot be held directly liable for the actions of other officers under the

circumstances of this case.[8] And the officers who did carry or force Scott to walk are not named defendants in this action, so the Court has no jurisdiction over them. In re Mosaic Mgmt. Grp., Inc., 2023 WL 4144557, at *4 (11th Cir. June 23, 2023)(finding no jurisdiction over nonparties).

The Court concludes that the summary judgment evidence establishes Officer Vazquez's use of force in the takedown of Scott was objectively reasonable in light of the surrounding facts and circumstances. The Court concludes that summary judgment in favor of Officer Vazquez is warranted as to Count II.

### (3) Qualified Immunity

Alternatively, Officer Vazquez asserts that even if the takedown was unreasonable, qualified immunity shields him from Scott's excessive force claim. (Doc. #48, p. 19.) The Court agrees.

Scott concedes that Officer Vazquez was performing a discretionary function (Doc. #53, p. 17), and the Court agrees.

---

[8] See Brown v. City of Huntsville, Ala., 608 F.3d 724, 737 (11th Cir. 2010)("To establish § 1983 liability, a plaintiff must . . . 'prov[e] that the official was personally involved in the acts that resulted in the constitutional deprivation.' Merely being present with the arresting officers is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command authorizing the arrest action.")(quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir.1986)); Griffin v. City of Atlanta, 2022 WL 345644, at *4 (N.D. Ga. Feb. 4, 2022)(finding plaintiff's excessive force claim for being forced to walk on a broken ankle after being tackled by an officer had no bearing on officers that did not themselves exert an application of force for plaintiff to walk).

Therefore, the burden shifts to Scott to show that: (1) the summary judgment facts show the officer's conduct violated a federal right, and (2) the federal right in question was clearly established at the time of the violation. See Tolan, 572 U.S. at 655-57. Assuming for the sake of this alternative argument that Officer Vazquez violated Scott's right to be free of excessive force, Scott must demonstrate that the federal right was clearly established in the context of this case at the time of the violation. To do so, Scott can identify (1) a binding and applicable case with indistinguishable facts, (2) a broad statement of principle within the Constitution, statute, or case law, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law. See Crocker, 995 F.3d at 1240.

Scott has made none of these showings. First, Scott does not identify applicable case law which found excessive force on materially similar facts. Instead, Scott cites only to broad principles establishing the qualified immunity standard. (See Doc. #52, pp. 17-19.) This does not suffice. To succeed on option one, Scott must point to a "prior decisions [that] gave reasonable warning the conduct at issue violated constitutional rights." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004) (quoting United States v. Lanier, 520 U.S. 259, 269 (1997)). He does not do so.

Materially similar case law exists but it suggests Scott's constitutional rights were <u>not</u> violated. <u>See</u> <u>Charles</u>, 18 F.4th at 691-99; <u>Fils</u>, 647 F.3d at 1290-91. The Eleventh Circuit "ha[s] repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." <u>DeGiovanni</u>, 852 F.3d at 1328(quoting <u>Saunders v. Duke</u>, 766 F.3d 1262, 1265 (11th Cir. 2014)); <u>see</u> <u>also</u> <u>Patel</u>, 959 F.3d at 1343 (11th Cir. 2020)("Indeed, our cases establishing this principle date to at least 2000."). Scott was not under control, was actively resisting, and was not obeying commands. It cannot be said that it was "clearly established" and "beyond debate" that Officer Vazquez's tackling of Scott was excessive force given the circumstances. <u>See</u> <u>Carroll</u>, 574 U.S. at 16. Scott fails to invoke the remaining two options. Accordingly, Officer Vazquez is alternatively protected by qualified immunity, and summary judgment is alternatively granted as to Count II.

**B. Count I – Excessive Force, City of Cape Coral and Chief Sizemore in Official Capacity Pursuant to 42 U.S.C. § 1983**

Count I asserts that the City of Cape Coral and Chief Sizemore (in his official capacity) are "liable for the violation of Scott's constitutional rights by Vazquez . . . ." (Doc. #35, ¶ 63.) Defendants move for summary judgment, asserting Scott cannot

"demonstrate a policy practice, or custom leading to the constitutional violation at issue in order to recover." (Doc #48, p. 10.)

"[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." Monell v. Dep't of Social Serv.'s, 436 U.S. 658, 690. For the municipality to face liability, Scott must show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). "Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise." Vineyard v. Cnty. of Murray, 990 F.2d 1207, 1211 (11th Cir. 1993).

"Here, because there was no underlying constitutional violation, [Scott's] municipal liability claim against the City fails as a matter of law." Baker v. City of Madison, Ala., 67 F.4th 1268, 1282(11th Cir. 2023). See also City of L.A. v. Heller, 475 U.S. 796, 799 (1986) (holding that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer" then no "damages against a municipal corporation" can be awarded); Knight ex rel. Kerr v. Miami-Dade Cnty., 856 F.3d 795,

821 (11th Cir. 2017)("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation."). The Court has found that Officer Vazquez did not use excessive force. This ends any liability by the City of Cape Coral or Chief Sizemore in his official capacity.[9] Officer Vazquez's motion for summary judgment as to Count I is therefore granted.

### C. Count IV – State Law Claim of Battery Against Officer Vazquez In His Individual Capacity

Count IV alleges a battery claim against Officer Vazquez in his individual capacity. (Doc. #35, ¶¶ 90-96.) It alleges that "Defendant Vazquez intentionally inflicted harmful or offensive contact upon the person of Scott." Id. at ¶ 91. Officer Vazquez

---

[9] "A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009)(citing Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir.1999)). Because they are essentially the same claim against the same party, when the liability for one falters the other necessarily follows. See Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015)("[F]or liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents.")(quoting Owens v. Fulton Cnty., 877 F.2d 947, 951 n. 5 (11th Cir.1989)). The Eleventh Circuit has even found that "there no longer exists a need to bring official-capacity actions against local government officials" when the municipality that officer works for is already a party to the suit. Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991). As a result, multiple sister districts have dismissed individuals sued in their official capacity because of redundancy. See Hayden v. Broward Cnty., 2013 WL 4786486 (S.D. Fla. Sept. 6, 2013); Moon v. Rockdale Cnty., 188 F. Supp. 3d 1369 (N.D. Ga. 2016); Duncan v. Bibb Cnty. Sheriff's Dep't, 471 F. Supp. 3d 1243 (N.D. Ala. 2020).

counters that because his use of force was reasonable, there is no valid claim for battery and thus summary judgment is warranted in his favor as to Count IV. (Doc. #48, pp. 15-19.)  The Court agrees.

Pursuant to Florida law, police officers are entitled to a presumption of good faith regarding the use of force applied during a lawful arrest, and officers are only liable for damages where the force used is "clearly excessive." Davis v. Williams, 451 F.3d 759, 768 (11th Cir. 2006) (quoting City of Miami v. Sanders, 672 So.2d 46, 47 (Fla. 3d DCA 1996)). Here, the Court has found that the amount of force used by Officer Vazquez was not excessive. Officer Vazquez's motion for summary judgment as to Count IV is therefore granted.

### D. Count V – State Law Claim of Negligence Against the City of Cape Coral and Anthony Sizemore, in his official capacity as Chief of Cape Coral Police Department

Count V of the Amended Complaint asserts a claim of negligence under Florida law against Cape Coral and Deputy Chief Sizemore (in his official capacity), alleging that they "had the duty to properly hire, train, evaluate, qualify, supervise and instruct his officers, and more specifically, Vazquez and Sewry[sic]-Martins." (Doc. #35, ¶ 101.) The Defendants counter that that the claim falls for two reasons. First, since Scott admits the officers were acting within the course of their employment, summary judgment is appropriate because "negligent hiring, supervision, and retention claims are not the appropriate claims to bring against

an employer whose employees are acting within the scope of their duties." (Doc. #48, p. 22.) Second, the Defendants argue "sovereign immunity bars Scott's challenge to the City's training." Id. Because the Court agrees with Defendants' first argument, it need not address the second argument.

As Defendants point out, "[u]nder Florida law, a claim for negligent hiring, retention, or supervision requires that an employee's wrongful conduct be committed outside the scope of employment." Buckler v. Israel, 680 Fed. Appx. 831, 834 (11th Cir. 2017). In his Amended Complaint, Scott admitted that Officer Vazquez was acting under the color of law and in scope of his employment:

> Defendant Vazquez, was and is, at all material times, an employee of the City of Cape Coral and the Cape Coral Police Department, employed in the capacity of a police officer and acted under color of state law. Defendant Vazquez, was acting within the course and scope of his employment and acting under color of law as an active and duly appointed police officer employed by Defendant Cape Coral.

(Doc. #35, ¶¶ 16-17.) It is also clear that all the other deputies at the scene were also acting in the scope of their employment. Thus, Scott's claim of negligent hiring, retention, and supervision merits summary judgment in Defendants' favor. See Buckler, 680 Fed. Appx. at 834 (affirming summary judgment as to plaintiffs' claim for negligent hiring, retention, and supervision

after plaintiffs "themselves plead that deputies acted within the scope of their employment . . . .").

Additionally, once this Court found Officer Vazquez acted reasonably, no negligence claim could exist against the municipality/Chief Sizemore in his official capacity since the underlying actions of the employees are not a tort. Winters v. Ranum, 730 Fed. Appx. 826, 830-31 (11th Cir. 2018) (citing Acts Ret.-Life Cmtys. Inc. v. Estate of Zimmer, 206 So.3d 112, 115 (Fla. 4th DCA 2016)). And with Scott limiting this Count to "specifically[]Vazquez," (Doc. #35, ¶ 101) the actions of the other officers are not at issue. Summary judgment is granted as to Count V.

### E. Count VI- State Law Claim of Negligence against Officer Vazquez In His Individual Capacity

Count VI of the Amended Complaint alleges a negligence claim against Officer Vazquez in his individual capacity. (Doc. #35 ¶¶ 104-112.) Scott claims Officer Vazquez "negligently failed to utilize proper police techniques for investigation of domestic disturbance calls, and intervention with citizens," id. at ¶ 107, "negligently failed to restrain Scott," id. at ¶ 108, and "negligently used excessive force against Scott, by fracturing his hip." Id. at ¶ 109. Defendants counter that "there is no cause of action for the negligent use of excessive force under Florida law

as there can be no such thing as a negligent commission of an intentional tort." (Doc. #48, p. 24.) The Court agrees.

As Defendants correctly point out, "Florida courts have consistently and unambiguously held that 'it is not possible to have a cause of action for negligent use of excessive force because there is no such thing as the negligent commission of an intentional tort.'" Secondo v. Campbell, 327 F. App'x 126, 131 (11th Cir. 2009)(quoting City of Miami v. Sanders, 672 So.2d 46, 48 (Fla. 1996)). A separate state law negligence claim can harmoniously co-exist with a claim for excessive force, but "the negligence component must pertain to something other than the actual application of force during the course of arrest." Sanders, 672 So.2d at 48.

Here, Scott claims Officer Vazquez "negligently failed to utilize proper police techniques for investigation of domestic disturbance calls, and intervention with citizens," (Doc. #35 at ¶ 107,) "negligently failed to restrain Scott," id. at ¶ 108, and "negligently used excessive force against Scott, by fracturing his hip." Id. at ¶ 109. All of these pertain to Scott's Terry detention and subsequent arrest, and therefore are not permissible negligence claims.

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. #48) is **DENIED AS MOOT** as to defendant Caroline Serwy-Martins and is otherwise **GRANTED**.

2. The Clerk of the Court shall enter judgment:

    a. in favor of defendants City of Cape Coral, Chief Anthony Sizemore, and Deputy Humberto Vazquez as to all counts of the Amended Complaint,

    b. in favor of defendant Caroline Serwy-Martins pursuant to the Order.

3. Plaintiff's Motion in Limine (Doc #65) and Defendants' Motion in Limine (Doc #66) are hereby **DENIED AS MOOT**.

4. The Clerk of the Court shall terminate any pending deadlines and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this __6th__ day of July 2023.


_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:
Counsel of Record

37